IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN LUCAS, | ) | CASE NO. 4:25-cv-00968-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Benjamin Michael Lucas ("Lucas"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

Lucas raises two issues on review of the Administrative Law Judge's ("ALJ") decision, arguing that:

1.      The ALJ's evaluation of the psychologist Karin Worrell, Ph.D.'s opinion is not supported by substantial evidence, and

2.      The ALJ's evaluation of the state agency psychological consultant opinions is not supported by substantial evidence.

(ECF Doc. 8, p. 17). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards, I recommend that the Commissioner's final decision denying Lucas' application for SSI be vacated and remanded for further consideration.

1

## II.    Procedural History

Lucas filed for SSI on October 11, 2022, alleging a disability onset date of October 22, 2020. (Tr. 294). The claims were denied initially and on reconsideration. (Tr. 196, 207). On July 24, 2023, Lucas requested a hearing before an ALJ. (Tr. 230). Lucas, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on January 16, 2024. (Tr. 131-69). On March 14, 2024, the ALJ issued a written decision finding Lucas not disabled. (Tr. 111-24). The Appeals Council denied Lucas' request for review on March 19, 2025, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). Lucas timely filed this action on May 13, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Lucas was born March 4, 1995. (Tr. 294). He was 27 years old on the date his application was filed, making him a younger individual according to agency regulations. (Tr. 122). He has at least a high school education, and no past relevant work. (*Id.*).

### B.    Relevant Medical Evidence[1]

On September 1, 2015, Lucas was separated from the United States Navy due to "[e]rroneous enlistment as evidenced by a physical or mental condition that existed prior to entry into the naval service." (Tr. 1984). Lucas had reported experiencing increasing anxiety and

---

[1] Lucas' allegations solely relate to his mental health impairments. The report and reccomendation is therefore similarly limited. He did not make any arguments related to his physical impairments, and, accordingly, any such is argument is forfeited. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("Arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.")

depression during his first week of training, and also that he had a history of receiving mental health services for emotional instability and suicidal ideations. (Tr. 1986).

Lucas attended an intake assessment with psychotherapist Karin Worrell, Ph.D., on August 20, 2020, noting that both he and his counselor suspected he had autism. (Tr. 771). Dr. Worrell noted that Lucas bounces when he walks, bites his nails, picks at scabs and cuts, paces when stressed, has a poor appetite, sleeps poorly, exhibits poor hygiene, makes limited eye contact, speaks extensively on topics in which he is interested, speaks in a monotone voice, does not read social cues, and has a history of social rejection and isolation. (*Id.*). He further is able to memorize certain things well, worries extensively, and is hypersensitive to sensory items. (*Id.*) He has a history of participating in counseling to treat depression that has grown worse since his father's death. (Tr. 772). Lucas was being prescribed hydroxyzine for anxiety, prazosin for nightmares, and Effexor. (*Id.*) Dr. Worrell diagnosed Lucas with Autism Spectrum Disorder ("ASD"); Post-Traumatic Stress Disorder ("PTSD"), chronic; and Attention-Deficit/Hyperactivity Disorder ("ADHD"), combined presentation. (Tr. 773).

In a psychotherapy session on October 14, 2020, Dr. Worrell determined that Lucas' ASD likely exacerbates his PTSD symptoms due to his tendency for obsessive thinking. (Tr. 778). At a November 17, 2020 session with Dr. Worrell, Lucas stated that he wanted to work but did not feel he could due to his inability to find enjoyment in it. (Tr. 780). His mood was determined to be anxious, and his functional status was "[i]mpaired." (*Id.*). Lucas continued to see Dr. Worrell on a monthly basis, and on January 6, 2021, he reported feeling guilt about the moments when he is enjoying life, and expressed that he felt he should be working and that he would contact the Bureau of Vocational Rehabilitation ("BVR") if he is denied disability. (Tr. 784).

At his March 3, 2021 session, Lucas reported that he had changed medication prescribers, and he had started taking trazadone and propranolol but was not yet feeing any positive effects of either. (Tr. 788). At his April 28, 2021 appointment, Lucas reported that he had attempted a BVR job but had made errors there due to issues with sensory overload and severe focus issues. (Tr. 793). He had also been overwhelmed by being around so many people and that job had been discontinued. (*Id.*).

On August 18, 2021, Lucas reported his medications had again been changed, and he was now prescribed Xanax, mirtazapine, gabapentin and Vyvanse. (Tr. 802). By September 15, 2021, he was considering returning to school and seeking employment, and he was also baking and selling artisan bread with his girlfriend. (Tr. 805). Prior to his October 13, 2021 session, however, he texted his counselor that he was so stressed he felt close to "hanging myself." (Tr. 808). At that appointment he indicated an interest in seeking a medical marijuana card to help with his sleep and nightmares, and also suggested he would like to find a job. (*Id.*). On December 8, 2021, he  reported he had started on Adderall, and he was feeling less anxious, his motivation had improved, he was feeling more on task, and was completing tasks more efficiently. (Tr. 814).

By January 5, 2022, Lucas reported feeling more anxious, and he was concerned his prescriber was going to discontinue his Adderall. (Tr. 817). As of March 8, 2022, his Adderall prescription had been terminated, and he felt the cancellation was negatively impacting his motivation, task completion, self-esteem, anxiety reduction and depression reduction. (Tr. 823). He also reported compulsively using social media to check medical information due to anxiety about his health. (*Id.*).

On April 5, 2022, Lucas reported he would be starting a part-time job through BVR stocking shelves. (Tr. 826). By April 28, 2022, however, that ended due to his anxiety and his poor performance. (Tr. 829). He reported disappointment that BVR would not help him find another job. (*Id.*). On May 31, 2023, Lucas reported he had experienced a panic attack that required an ambulance to be called, although he was not transported to the hospital. (Tr. 835).

On August 18, 2022, Lucas underwent a psychiatric intake in order to begin medically assisted treatment. (Tr. 990-95). He reported hopelessness, depressed mood, but noted his sleep and energy had improved with gabapentin. (Tr. 993). He rated his concentration and attention as "very poor", and it was affecting his ability to read, write, watch television, or drive. (*Id.*). His anxiety symptoms had drastically decreased since he stared on gabapentin, and marijuana had helped manage his nightmares, although he still reported flashbacks, disassociation, numbness, irritability and avoidant behaviors. (*Id.*). He noted he would become angry when he was overstimulated. (*Id.*).

On January 10, 2023, Lucas reported he has not "been doing well mentally," noting that he has been pacing daily to try to reduce his anxiety. (Tr. 1029). He has had significant health anxiety, leading to obsessing, and interfering with his ability to focus on anything else. (*Id.*). He stated that he had been doing much better when he was prescribed Adderall, but he has been unable to find a new provider willing to begin his prescription again. (*Id.*).

Lucas underwent a psychiatric evaluation on February 8, 2023, and said that he was experiencing anxiety "every day all day." (Tr. 1031). He did report that his medications have helped him manage his depression and insomnia. (*Id.*). He asked to be prescribed ADHD medications as he had previously felt normal and motivated when taking them. (*Id.*). He had an existing ASD diagnosis, and the examiner noted he made no eye contact, he had issues with food

and clothing textures, and he would miss social cues. (*Id.*). He reported constantly losing focus and concentration. (*Id.*). He was diagnosed with PTSD; major depressive disorder, recurrent episode, moderate; ASD; and ADHD, predominantly inattentive presentation. (Tr. 1036).

On June 15, 2023, Lucas reported that he was enjoying volunteering at a farm, but that he was feeling more hopeless and had been experiencing passive suicidal ideation. (Tr. 1875). His current mental status indicated severe depression, moderate irritability and moderately to severely impaired functional status. (Tr. 1874). By July 20, 2023, he was feeling "emotionally and socially exhausted" following the death of his uncle. (Tr. 1878). On November 2, 2023, he stated that he felt his ADHD was causing dysfunction and raising his anxiety, and he was still hoping to get prescriptions for ADHD medications. (Tr. 2151). On December 26, 2023, he was charged with an OVI. (Tr. 2077). He denied being intoxicated when he was pulled over, but admitted he still smelled like marijuana after smoking it four hours earlier. (*Id.*).

### C.    Medical Opinion Evidence

#### 1.    State Agency Reviewing Opinion Evidence

On February 6, 2023, state agency reviewing psychologist Irma Johnston, Psy.D., opined that Lucas had moderate limitations in the domains of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 201). She adopted the RFC findings of a prior ALJ decision dated October 27, 2020, which found relative to mental health that Lucas could perform simple, routine, and repetitive tasks, and make simple work related decisions, but not at a production rate pace; he was limited to brief, superficial interactions with supervisors, coworkers, and the general public, and he can tolerate few changes in a routine work setting. (Tr. 177, 204). On June

3, 2023, state agency reviewing psychologist Cindy Matyi, Ph.D., affirmed Dr. Johnston's opinion. (Tr. 212).

### 2.      Treating Source Opinion Evidence

In a miscellaneous note dated November 1, 2022, Dr. Worrell opined that Lucas'

> ability to do work-related activities and/or mental actives are hindered significantly due to his medical conditions. His conditions significantly and severely hinder his ability in all of the following areas; understand; remember; maintain concentration, persistence and pace; carrying out instructions; and responding appropriately to supervision, coworkers and work pressures.

(Tr. 907.)

Dr. Worrell completed an Assessment of Ability to do Work-Related Activities (Mental) and an Off-Task/Absenteeism Questionnaire on December 26, 2023, determining Lucas had serious limitation in the areas of relating to other people; maintaining concentration and attention for extended periods; sustaining a routine without special supervision; performing activities within a schedule, maintaining regular attendance, and being punctual; understanding, carrying out and remembering instructions; responding appropriately to supervisors and co-workers; responding appropriately to changes in the work setting, performing complex, repetitive or varied tasks; and behaving in an emotionally stable manner. (Tr. 2122). She further noted fair limitation with performing simple tasks. (*Id.*). Dr. Worrell further opined that Lucas' condition would likely deteriorate if placed under stress, including the stress of simple routine work. (*Id.*). With regard to off-task behavior and absenteeism, Dr. Worrell found that Lucas would be absent more than five times monthly and he would be off-task at least 20% of the time. (Tr. 2123). She stated he would be easily distracted, had obsessive thoughts, overfocused on details, was distracted and agitated by sensory issues, and had memory issues. (*Id.*). She diagnosed poor focus and attention due to executive dysfunction, ADHD, social anxiety, ASD, sensory issues,

obsessive-compulsive disorder, anxiety and depression, and noted he would need many breaks due to mental exhaustion. (*Id.*).

### D.  Administrative Hearing Evidence

On January 16, 2024, Lucas testified before the ALJ that he was a high school graduate living with his mother. (Tr. 138). He was taking medications to treat his anxiety, depression, and PTSD. (*Id.*). He reported receiving mental health care at Churchill, where his medications are prescribed. (Tr. 140). He is treated there for anxiety, depression, PTSD, and ADHD. (*Id.*). He has experienced side effects including increased sleepiness and appetite from his medications. (*Id.*).

Lucas testified that his depression affects his motivation, his ability to interact with others, his completion of daily tasks, and his ability to sleep. (Tr. 141). He has crying spells lasting an hour every other day. (Tr. 142). He tries to distract himself by watching television or reading. (Tr. 143). Lucas further testified that he has anxiety that is made worse by social situations and traumatic or emotional events. (*Id.*). He can have panic attacks as often as a couple of times weekly, or as little as monthly. (*Id.*). He feels his anxiety medications have helped him get through his attacks. (Tr. 144). Lucas reports nightmares and flashbacks, and his flashbacks cause him to dissociate. (Tr. 145). He has been on ADHD medications before, but has not found them to be helpful. (Tr. 146). He reports that he is easily distracted, which affects his ability to have conversations. (*Id.*). He testified that he had tried to do a stocking job through BVR, but it only lasted a week because he could not maintain his focus and he was making mistakes. (Tr. 147).

Lucas testified that he is able to do chores such as washing dishes or wiping off countertops, but he does not cook for himself or do his own laundry. (Tr. 148). He can only drive if someone is with him, because of anxiety. (*Id.*). He no longer bakes bread or makes jams,

volunteers, or play video games, mostly due to wrist pain. (Tr. 148-49). He does not have a girlfriend or friends he regularly does things with. (Tr. 149).

Under questioning by his attorney, Lucas testified that he had panic attacks when he tried to work at Giant Eagle through BVR, mainly due to overstimulation and the expectation of interacting with customers. (Tr. 150). He reported oversensitivity to bright lights and loud sounds, and he has trouble thinking and speaking clearly when around other people. (Tr. 151).

Once Lucas' testimony was completed, his mother, Kimberly Lucas, testified. (Tr. 153-59). She stated that Lucas' most significant issues were his anxiety and social anxiety, noting that around other people he has trouble focusing, gets nervous and his anxiety gets to the point where he gets sick and passes out. (Tr. 153). He has been having panic attacks since he was a child, and he has been suicidal at times. (Tr. 154). The anxiety attacks occur daily, and he calls her at work at least three to four times weekly to tell her he is experiencing an attack. (Tr. 155). He also had anxiety when he tried to work at Giant Eagle. (Tr. 156). At times he has to be reminded to perform basic hygiene because of his depression. (Tr. 157). She testified that Lucas is no longer smoking marijuana, and that she does not know the circumstances of why he was in Boardman, Ohio at the time he was cited for Driving Under the Influence. (Tr. 158-59).

Finally, Vocational Expert George Coleman testified. (Tr. 161-68). The ALJ determined there was no past work to consider, so he posed his first hypothetical. (Tr. 162). The ALJ asked the VE to consider a younger individual with a high school education who can lift, carry, push and pull 20 pounds occasionally and 10 frequently; can sit for six hours; stand and/or walk for six hours in a normal workday; cannot climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; can occasionally kneel and crawl; can frequently handle, reach and finger with the right upper extremity; must avoid workplace hazards such as unprotected heights and

9

exposure to dangerous moving machinery; cannot perform any commercial driving; would be limited to simple, routine tasks that involve no more than simple work-related decision making; occasional interactions with others that does not involve arbitration, negotiation, or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; cannot perform assembly line work or work that involves strict production quotas; and would be limited to occasional workplace changes that are gradual and explained in advance. (Tr. 163). The VE opined that this individual could work as an office helper or clerical assistant, DOT #239.567-010, SVP 2, light, with 83,250 jobs in the national economy; as a mailroom clerk, DOT #209.687-026, SVY 2, light, with 24,770 jobs in the national economy; and as a routing clerk, DOT #222.687-022, SVP 2, light, with 83,715 jobs in the national economy. (Tr. 164).

For his second hypothetical, the ALJ asked the VE to consider the same circumstances of the first hypothetical, except that this individual would be limited to occasional interactions with coworkers and the public, and the individual would require frequent redirection from a supervisor in order to stay on task, and this level of redirection would continue for the length of the employment. (Tr. 164-65). The VE opined that the limitations of this hypothetical would be inconsistent with competitive, unskilled work opportunities, and would be more consistent with a sheltered work environment. (Tr. 165).

For his third hypothetical, the ALJ returned to the first hypothetical but added the additional limitation that the individual would be off task in the work setting 33% of the day on an ongoing basis. (*Id.*). The VE opined that there would be no jobs for this individual, as the VE's experience was that employers would tolerate no more than 10% off task time. (Tr. 166).

Lucas' attorney then posed his first hypothetical to the VE, asking him to consider the same individual from the ALJ's first hypothetical, except with further restriction to the dominant right hand, limiting it to only occasionally lifting five pounds, and occasionally handling, reaching and fingering. (Tr. 167). The VE opined that there were no jobs such a hypothetical person could perform. (*Id.*). Lucas' attorney then posed a second hypothetical, again asking the VE to consider the individual from the ALJ's first hypothetical, but adding the additional limitation that the individual would be absent four times per month on an ongoing basis. (*Id.*). The VE opined that there would be no jobs available for that individual, as he believes employers will tolerate no more than one absence per month. (*Id.*).

## IV.    The ALJ's Decision

In his decision dated March 14, 2024, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since October 9, 2022, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: right wrist avascular necrosis, posttraumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), depressive disorder, autism spectrum disorder, and anxiety disorder (20 C.F.R 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967 (b) except no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasionally kneeling or crawling; frequently reaching, handling or fingering with the right upper extremity; avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; no commercial driving; limited to simple, routine tasks that involve no more than simple work-related decision making; occasional interaction with others that does not involve arbitration, negotiation or confrontation; cannot direct the work of others or be responsible for the safety or welfare of others; cannot perform assembly line

work or work that involves strict production quotas; and is limited to handling occasional workplace changes that are gradual and explained in advance.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on March 4, 1995 and was 27 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has at least a high school education (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since October 9, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-43).

## V.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "'more than a scintilla of evidence but less than a preponderance.'" *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1004 (6th Cir. 2025) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). It means "'relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103, (2019)). Even when an ALJ's decision is supported by substantial evidence, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Nor will this Court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Lucas raises two issues for this Court's review, arguing that:

1. The ALJ's evaluation of psychologist Karin Worrell, Ph.D.'s opinions is not supported by substantial evidence, and

2. The ALJ's evaluation of the state agency psychological consultant opinions is not supported by substantial evidence.

(ECF Doc. 8, p. 17).

### A. The ALJ's evaluation of Dr. Worrell's opinions was deficient in that it did not address the supportability factor.

Lucas argues that the ALJ's analysis of Dr. Worrell's opinions failed to satisfy the requirements of 20 C.F.R. 416.920c because he did not address the issue of the supportability of the opinions. (*Id.* at p. 21). Lucas disputes the ALJ's claim that Dr. Worrell's opinions concerning time off-task and absenteeism was based on "little supporting evidence" and plaintiff's subjective allegations. (*Id.*). Rather, as Lucas contends, the bases of Dr. Worrell's opinions included "a medley of abnormalities in behavior, mood, thought, development and perception." (*Id.*). Lucas adds that the ALJ did not address these actual stated bases of Dr. Worrell's opinion, and accordingly does not provide subsequent reviewers with the ability to engage in meaningful review of the decision. (*Id.* at p. 22).

The Commissioner responds that there is substantial evidence that Dr. Worrell's opinions were unsupported by and inconsistent with the record. (ECF Doc. 10, p. 5). In the Commissioner's view, the ALJ discussed in detail Dr. Worrell's notes from multiple examinations that show an inconsistency with her opinion that Lucas would be off-task more than 20% of the workday, and absent at least four times per month. (*Id.* at p. 6). Further, the ALJ's decision articulated inconsistencies with other evidence in the record, noting that Lucas received only conservative treatment for his mental health impairments, and that the record lacked evidence of hospitalizations or any significant side effects of medications. (*Id.*). The ALJ also stated that Dr. Worrell's opinions were inconsistent with Lucas' activities of daily living. (*Id.* at p. 6-7). Finally, the Commissioner contends that the ALJ wrote that Dr. Worrell "provided little supporting evidence or explanation for the extreme limitation aside from listing Plaintiff's diagnoses and subjective allegations, which were inconsistent with the evidence above." (*Id.* at p. 7).

Lucas has the better of this argument. An RFC determination is a legal finding, not a medical determination; it is thus for an ALJ – not a physician – to determine a claimant's RFC. *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); *see also* 20 C.F.R. 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.") Even if an ALJ finds an opinion wholly persuasive, "an ALJ is not necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-00260, 2014 WL 346287, *11 (N.D. Ohio Jan. 30, 2014).

An ALJ is no longer obligated to give "good reasons" for not adopting a consultant's opinion as written. *Cf.* 20 C.F.R. § 416.927(c)(2). Instead, the ALJ's only articulation duty is to describe "how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R § 416.920c, *see also Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, *5 (N.D Ohio Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two "most important" factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c.

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency,

16

"[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . . 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom.*, *Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D. Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B. v. Comm'r of Soc. Sec.*, No. 3:20-CV-442, 2022 WL 3445856,at *3 (S.D. Ohio Aug. 17, 2022) (citing *Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021)).

In assessing Dr. Worrell's opinions, the ALJ determined them to be unpersuasive, writing that Dr. Worrell:

> [c]oncluded in a letter from November of 2022 that the claimant's conditions significantly and severely hinder his abilities in maintaining attention and concentration, carrying out instructions, and relating to others in a workplace without any improvement expected in the next 12 months (Exhibit B13F, pg. 1; B17F, pg. 2; B27F, pg. 1). Dr. Worrell also completed an assessment of ability to do work-related activities in December of 2023 (Exhibit B39F). In this assessment Dr. Worrell concluded in checkbox form that the claimant has mostly "serious limitations" in areas such as relating to other, behaving in an emotionally stable manner, and handling workplace pressures. Moreover, Dr. Worrell determined that the claimant would miss more than four workdays due to his impairments and be off task at least 20 percent of the workday. These opinions are inconsistent with the medical record as a whole, including the claimant's positive response to his counseling sessions and psychotropic medications, without evidence of psychiatric hospitalization or significant medication side effects noted in the record, his mostly

17

> unremarkable reported symptoms to providers, and his varied activities of daily living that indicate a greater level of functioning than alleged issues such as having a side business, house sitting and fishing. (Exhibits B7F; B13F; B15F; B17F; B18F; B34F; hearing testimony). Moreover, Dr. Worrell provided little supporting evidence or explanation for these extreme limitations aside from largely listing the claimant's diagnoses and subjective allegations, which are not fully consistent with the records for the reasons listed above.

(Tr. 121).

In regards to consistency, the ALJ wrote that Dr. Worell's opinions were inconsistent with the medical record as a whole, and specifically noted that the draconian limitations in her opinions were inconsistent with his positive response to counseling and medications, his lack of psychiatric hospitalization, his mostly benign mental health symptoms, and his activities of daily living. (*Id.*). This analysis of the consistency of Dr. Worrell's opinions with the medical record provides a coherent explanation for subsequent reviewers to discern how the ALJ arrived at his conclusions, well exceeding the minimum level of articulation required to determine whether the decision was supported by substantial evidence. *Heather B.*, 2022 WL 3445856, at *3. As the ALJ cites substantial evidence in support of his evaluation of the consistency of Dr. Worrell's, it survives review here.

Where the ALJ's analysis is lacking, however, is in its failure to appropriately assess the supportability of the opinions. The Commissioner appears to suggest that the final sentence of the ALJ's evaluation of Dr. Worrell's opinion noted above, decrying "little supporting evidence or explanation for these extreme limitations aside from largely listing the claimant's diagnoses and subjective allegations" satisfies the supportability assessment requirement. This, contention is not, however, borne out by a review of Dr. Worrell's opinion. (Tr. 1222-23). Dr. Worrell's two-part opinion, completed on the same date, includes both a checkbox format and space for further explanation. (*Id.*). In the additional space, Worrell wrote that "ADHD and Autism are

18

from birth and are lifelong – both create chronic problems daily with task completion, social interaction & mood (creates anxiety & depression)." (Tr. 1222). Further, Dr. Worrell writes that Lucas will likely be off-task because he "often misunderstands directions, social scenarios distract from task completion due to anxiety and misinterpretation." (Tr. 1223). She adds that Lucas will be unable to concentrate, pay attention and/or focus on a sustained basis due to "permanent executive dysfunction (ADHD from birth), social anxiety, sensory issues, obsessive thought (Autism since birth), anxiety and depression. (*Id.*) Finally, Dr. Worrell adds that he will experience "mental exhaustion due to Autism and ADHD combined – needs many breaks (shuts down emotionally)." (*Id.*).

In *Fleischer*, the court noted it "cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an *accurate* and logical bridge between the evidence and the result.'" 774 F. Supp. 2d at 877 (emphasis added); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Here, the ALJ did not meet the accuracy component. Dr. Worrell's thorough explanation of how she arrived at her opinion, using medical terminology, is not, as the Commissioner asserts, a mere listing of diagnoses and Lucas' own subjective allegations. It is, rather, a detailed evaluation tied directly to her own treatment of Lucas, and consistent with the generally subjective nature of mental health care.

Determining that Dr. Worrell's opinions were unpersuasive on this flawed assessment of their supportability failed to build an accurate and logical bridge, and, accordingly, does not stand muster. I therefore recommend remand as the appropriate remedy here.

**B.      The ALJ properly evaluated the opinions of the state agency psychological consultants.**

Lucas further argues that he is entitled to judicial relief because the ALJ did not discuss the supportability factor when assessing the state agency psychological consultants' opinions. (ECF Doc. 8, p. 23). He contends that the consultants adopted the RFC findings from a prior ALJ decision under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, (6th Cir. 1997), but did not provide any supportive explanation for why he did so. (*Id.*). This is, in Lucas' view, created an unwarranted procedural burden on his current application for benefits in violation of the Sixth Circuit's decision in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). Thus, Lucas argues, in applying *Drummond* without citing to the record to explain why they were doing so, the ALJ did not comply with the guidance in *Earley*. (ECF Doc. 8, p. 25).

The Commissioner retorts that substantial evidence supports the ALJ's evaluation of the opinions of the state agency psychological consultants. (ECF Doc. 10, p. 3). The Commissioner asserts that the ALJ did not just reflexively adopt the findings of the prior ALJ, rather, he considered the evidence that post-dated the previous denial and determined that there was no new and material evidence requiring more restrictive mental limitations. (*Id.* at p. 4). Further, the ALJ in the current case found the opinions of the consultants only "mostly persuasive" and adopted a more restrictive RFC than which the consultants suggested. (*Id.*). The Commissioner contends that the adoption of a more stringent RFC than the consultants recommended can result in no more than harmless error, and, accordingly, should not be the basis for remand. (*Id.*).

In *Drummond*, the Sixth Circuit held that previous decisions "clearly demonstrate that the principles of res judicata can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d at 842. The Social Security

Administration adopted this decision as Acquiescence Ruling 98-4(6). In this Ruling, the

Administration instructed that:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators *must* adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id*. (emphasis added).

The Court in *Earley,* however, moderated that guidance, explaining that "[w]hen an

individual seeks disability benefits for a distinct period of time, each application is entitled to

review. There is nothing in the relevant statutes to the contrary. And res judicata only

'foreclose[s] successive litigation of the very same claim.'" 893 F.3d at 933 ("[A] claim that one

became disabled in 1990 is not the same as a claim that one became disabled in 1994."). Rather,

under *Earley*, a claimant is entitled to a "fresh review," *id*. at 934, free from the presumption that

a previous "RFC remains the correct RFC for" a later claim. *Najdl v. Comm'r of Soc. Sec.*, No.

21-cv-01578, 2022 WL 2820413, *9 (N.D. Ohio July 8, 2022), *report and recommendation

adopted*, 2022 WL 2818444 (N.D. Ohio July 18, 2022); *Ferrell v. Berryhill*, No. 16-cv-0050,

2019 WL 2077501, *5 (E.D. Tenn. May 10, 2019) ("The point of *Earley*, . . . is that regardless of

her chances of success, an applicant should have the opportunity for a full hearing, *with no

presumptions applied*, when the claim covers a new period of time not addressed in the prior

hearing.") (emphasis added).

The Sixth Circuit also said in *Earley* that "it is fair for an administrative law judge to take

the view that, absent new and additional evidence, the first administrative law judge's findings

are a legitimate, *albeit not binding*, consideration in reviewing a second application." 893 F.3d at

21

933 (emphasis added). An ALJ may "consider a previous ALJ's RFC" determination but "errs . . . when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, No. 18-cv-00859, 2019 WL 8016516, *5 (W.D. Mich. Apr. 17, 2019), *report and recommendation adopted*, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020).

Here, the ALJ correctly applied the instruction of *Earley*, specifically noting:

I am not bound by the residual functional capacity of the prior ALJ decision of October 22, 2020 (Exhibit B1A) under Acquiescence Rulings 98-3(6) and 98-4(6). This decision was made over three years ago, and new and material evidence documents a significant change in claimant's condition since then…[n]evertheless, I have adopted some of the mental limitations from the prior decision in the residual functional capacity.

(Tr. 114). This demonstrates that the ALJ did not merely rely on the prior ALJ's decision in determining the appropriate RFC. The ALJ's adoption of "some of the mental limitations" does not itself create error, as he took a fresh look at the record before reaching his own conclusions. *Crawley v. Comm'r of Soc. Sec.*, No. 1:24-cv-1760, 2025 WL 1442562, *10 (N.D. Ohio, May 20, 2025).

Nor is there any error in the ALJ's evaluation of the opinions of the state agency consultants. The ALJ, while noting that the opinions were adoptions of the prior ALJ's findings, also articulated that the opinions were "generally consistent . . . with the claimant's medical records and treatment history, without evidence of psychiatric hospitalization or other serious issues since the alleged onset date. Additionally, the [state agency] consultants thoroughly reviewed the medical record, and they are experts regarding Social Security Disability." (Tr. 121). This satisfied the "minimal level of articulation" required to allow a reviewing court to determine whether her disability determination was supported by substantial evidence. Accordingly, remand is not recommended on this issue. *Heather B.*, 2022 WL 3445856, at *3.

## VII.    Recommendation

Because the ALJ failed to apply proper legal standards in evaluating the opinion of Dr. Worrell, I recommend that the Commissioner's final decision denying Lucas' application for SSI be vacated and that Lucas' case be remanded for further consideration of Dr. Worrell's opinion, but be affirmed as to the second issue regarding the application of *Drummond* and *Earley*.


Dated: January 26, 2026

Reuben J. Sheperd
United States Magistrate Judge


_____


## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.


\*\*\*


Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)